May it please the Court. I'm William Simpich, and I'm here with Testify Sadek. We're going to split up the argument this morning. I'm going to address the issue of the statute of limitations and the summary judgment that was issued against those plaintiffs, and I'm going to also address the discovery dispute with the Court in this matter. Mr. Sadek is going to address the Daubert issues that arose in the prima facie discussion and then again in the summary judgment discussion. Okay. Thank you. So where I'd like to begin is that it's our contention that what needed to happen here was an individualized analysis, and that individualized analysis had to be done by plaintiff by plaintiff, and it was specifically about an evaluation of the awareness in plaintiff's individual communities of a specific fact or an event, and that was, in fact, a jury question. And that was a discussion that should have happened, and the ruling that should have happened. Let me ask you a question before you go too far. It's my understanding that you have the burden of proof on this particular issue. Would you say so on the statute of limitations? We do. We have to address the discovery rule. And you, therefore, have to suggest that the plaintiff, that a reasonable person, either would not have been expected to inquire about the cause of her injury within a year of the filing, or even if she was on inquiry, that an injury would not have disclosed the cause of the injury, correct? That's correct. So as you understand it then, when one is on inquiry, one has a year to make the filing, as long as that person already would have been disclosed the cause of the injury. That's correct, Your Honor. So they have a year of discovery. Let's just put it on discovery. Right. And you're suggesting that in this particular situation there are disputed facts which would suggest that the law as applied in this situation should not have been applied? That's correct, Your Honor. Are there any really disputed facts? There are, Your Honor. I mean, what are the disputed facts? It seems to me you have some affidavits that say I didn't know, but I don't know whether that's really the issue. It seems to me that we have facts that have transpired through the situation, and now the judge is, in fact, applying the law to those facts. And the facts that we contend are at issue, for example, is whether they were living there before the time began to run, whether they were subscribing to the paper, whether they read the paper. Was that news coverage equivocal or unequivocal? All those are disputed facts, Your Honor. And that's really the big analysis that has to take place here, because a jury has to decide whether to impute knowledge to these plaintiffs. Excuse me. May I ask the same question in a very different way? Certainly. And that is, what fact do you say that any plaintiff knew within the year that they didn't know before? Probably there was a lawyer involved. Sorry? Probably there was a lawyer involved, Your Honor. The whole point here is to be able to – Went to a lawyer for a reason. What I'm saying, Your Honor – But what tipped them to do it? What tipped any plaintiff to file when they filed? What fact tipped them to do that that they didn't know or wasn't available a year before? Well, that's why I made the comment about the lawyer, because that's not our burden, about what tipped them. It simply was as the time began. It's helpful to see, because it appears as if there was no difference. That is, the body of knowledge that was available to people who lived in Willits as of 1999 was the same as it was in 2000. Well, be that as it may, Your Honor, the fact remains they went forward. They didn't have a duty to wait until the statute of limitations was about to run. In fact, just a couple years ago, our judge issued more rulings in our favor on this very subject. The body of knowledge coming from lawsuits, public notices, public meetings, signs posted about water contamination, a depository at the public library about contamination and health concerns, health surveys going or flying around town, if there's all that there from which a plaintiff living in a small community could be expected to realize there's a problem here that may have to do with my injury, then what changed? What changed, Your Honor? What I'm saying is what changed is lawyers came there, brought in by individuals, and they had meetings. It was as simple as that. I can't make up facts that don't exist. Okay. Thank you. Okay. And what happened here was we had no imputation because there was a number of people who didn't live there before the time began to run. There was a number of people who didn't subscribe to the paper. There was a number of people who didn't read the paper. And if you read that paper, I would offer that you couldn't learn anything because it was totally equivocal. There was no focused discussion saying, oh, there's a danger. In fact, you read those newspaper articles and they say no cause for alarm. However, the court suggests that the newspaper is not the big event, that in fact a villa file sued on October 29th. There's substantial publicity about the health risk posed by the contamination. There's a time when a villa's out conducting her own health surveys. There's a time when attorneys gave talks warning about the consequences of the statute of limitations, that that occurred in August the 4th of 2000. And that as I understood it, the district court then is suggesting that that makes one on notice. And if one is on notice, they could have disclosed the cause. And what we're saying is that's an individualized jury question about whether in that community those facts would reasonably be known. That's what O'Connor says at 1152 and 1157. A jury has to decide whether to impute knowledge of the contamination to the plaintiffs, whether the plaintiffs were on inquiry notice that the polluters were the likely cause of the illness, and when plaintiffs had the means to discover the facts to support the claim. If there's a duty to investigate, yes. But there's no duty to investigate until that individual plaintiff, not the group, has reason to investigate because they know. And that's what Nelson says. You have to know there's a problem. Well, you don't have to know. You have to know or should have known. And that, again, Your Honor, is a jury question. That's what O'Connor and Nelson tell us. Well, but I don't know whether they say that because, frankly, there are summary judgments in those kind of cases. And in other tort litigation like this where all the facts are out there and one looks at the facts the way they are and they're not disputed, that those are the facts as to what went out there. And at that particular point in time, the judge can apply the law and say one should have known. Right. And that's why we're asking the Court to apply Nelson here because in Nelson they said you don't have an obligation to read newspapers. You don't have an obligation to read the television news. If your doctor didn't tell you there's a problem, you don't have a duty to go hunt the media and seek it out. That's what Nelson tells us, and that's what we're standing on here. And if I may, I... And so in your mind, what is the day the statute started running? It hasn't run yet, in my honest opinion. In the Court's order, what did he or she suggest was the day the statute started running? The Court stated the date we filed the lawsuit, and that's the fundamental error here. That, again, says that you've got to be monitoring the papers for a lawsuit. We think that's not the law, and Nelson and O'Connor, we think, are very clear on that. And if I may, I'd like to say just a couple words on the discovery issue and then turn it over to co-counsel. On the discovery issue, we think this is an egregious error, abuse of discretion. We came to a point in the case where the Court said, I want you to come forward with your expert first on the issue of medical issue and on the issue of exposure. We said, okay. And then the Court issued a new order as we were tussling over the interrogatories and all, because they tried to have us address every single issue in the case. And the Court said, not only do I want you to address every issue of causation, but you've got basically 45 days to do it with your experts. And then two weeks later, she basically gutted our case, tossed out our expert on Daubert. And so what we did was we fortified him with two additional experts. He strengthened his opinion. And we met her deadline. And her deadline was, I want this evidence by thus and such a date. If you don't submit it, there will be an issue sanctioned. So we met it. As far as we were concerned, and still stay, we met our burden. There was no deadline after that point. Are we talking about the March 15, 2008 deadline? We are, Your Honor. Did you ever request an extension? We – two weeks – in January, we asked the Court for six months. She said no. Well, as I understood it in reading the record, and I guess maybe you can help me out, there was never an extension sought on the March 15, 2000 deadline. In fact, she just missed the deadline and then said that you should be allowed to have disclosure at the same time as the expert deadline. What happened was in November, she said answer these discovery by, say, January. We filed a motion to compel saying we needed another six months. She said no in January 23rd order and added, I'll give you until March 15th. And by then, you've got to submit. And if you don't submit, then there will be an issue sanctioned. And we submitted. So there's no way outside of finding some invisible ink in her order, I would humbly suggest, any hint that we would not be allowed to bring forward new experts on the issues of fate and transport or anything else, any hint that we would not be allowed to continue our fact discovery. In fact, two months later, she set final dates for fact discovery and expert discovery. It's an egregious error. There's no excuse. Thank you. Okay. Thank you, Mr. Professor. Good morning, Your Honors. May it please the Court. My name is Tesfai Sadiq. I will be arguing the issue of the Lone Pine order or CMO 4 or the prima facie order, whichever name we want to give it. My point is, really, there is no explicit Federal statute or Federal rule that allows prima facie order. It's only allowed under Federal Rule 16. And in sort of the Rule 16 confers quite broad discretion on the district court to manage the case in front of the court. And at the time, the district court is sitting there and saying, look, five years have gone by. And, I mean, I'm kind of astonished that you guys had all that time. I mean, in today's Federal court world, that's a very, very long time to get your act together. So the district court says, in light of the fact that there have been five years, I'm going to require the plaintiffs to put something on the table. What's an abuse of discretion about doing that? That's a good point, Your Honor. The abuse of discretion is mainly because at that point, you know, when the district court issued the Lone Pine order, our case was on track. There has been substantial discovery completed. The plaintiffs have submitted 40 pages response to questionnaire, which contains about 350 questions. The plaintiffs have provided each one of them explorer information as to where they lived, what kind of chemicals they were exposed, for how long period of time, the duration, the frequency. They have also provided information about what kind of other chemicals they used in their house. Were they gardening and were they using any kind of herbicide? They provided all that information. And the only thing that was really at that stage that was missing was really the causation, the expert report. And the question is, couldn't that be handled through the summary judgment procedure? Was there a need, you know, to depart from the well-tested procedure of summary judgment procedure, use that procedure to provide, you know, expert disclosure under Rule 26, provide, you know, opportunity to file a rebuttal? There was no need, you know, because there was already discovery completed. The judge could have set, you know, a date for expert disclosure under Rule 26, and the What the CMO did in this case, you know, was simply it's completely deviated from the summary judgment procedure. What it did was it denied plaintiffs the right to have their case adjudicated through the summary judgment procedure where, you know, the law established, you know, check and balance as to the role of a judge, as to the role of a jury. In the prima facie case, the judge really became the finder of fact. The pretrial procedure provided the judge to adjudicate the fact by the district court, you know. It really eliminated the quantum of proof we needed, you know, in summary judgment. But under Rule 26, the district court has the authority to set a sequence for when expert testimony can be disclosed, don't they? That is correct, Your Honor. Therefore, if I am going to suggest that the district court in this matter didn't do it correct, I've got to suggest that she abused her discretion, have I not? We are not really so much talking about the authority of the courts setting sequences for the disclosure of experts, you know. What we have here is really a Lone Pine order that simply eliminated the summary judgment procedure and made the judge the finder of fact in this case at the pretrial. But in this particular situation, even though she shortened the schedule, she then gave you an extension, correct? Yes, she did. And at that time, since she'd given you one extension, it seems to me that at the same time, Whitman had the same shortened schedule that you did, correct, your clients? I believe it. She didn't give a different schedule to the other side than she gave to you, correct? I think, you know, you're right in a way, but also the fact is really, Your Honor, we were required to provide our expert report earlier, and then the defendant was asked, you know, almost four months later to provide their response, you know, to our experts. It's a shortened schedule as well. I don't know if that is a shortened schedule compared to us. What we have is really to respond to the experts. We had only about 40 days, you know. When you say you had insufficient time to depose the experts, did you ever ask for more time? I didn't find that in the record. I believe, I don't think there was any request to ask for information or time to depose. In my book, I was looking. I mean, I was a DJ before, and so when I'm limiting the time to depose experts, and especially on summary judgment, if all the information is in the hands of the other party, I'm pretty willing to allow extra time. But I didn't find anything in there that suggested that your side even asked for more time to depose experts. The question is really, even if you depose your experts, you know, really it becomes meaningless if you are not allowed to file a supplemental rebuttal report based on their expert report, you know. That's exactly what the district judge did. You know, the district judge denied us to file supplemental rebuttal report, you know. After their expert was filed, we could have gone and really taken the deposition, you know. What's the point of taking the deposition if we can't file any document and our deadline is already set on March 15 or February 15? Really, it becomes, on our part, you know, it may not be a good practice at that point, you know. And the other point, Your Honor, is with respect to the Darbert issue. We believe, you know, that our experts' opinion was factually supported, and the methodology the expert used was scientifically accepted methodology. And the first Darbert ---- This is my standard of review on that decision. On the Darbert decision? Yeah. The standard review is really, I would say, an abuse of discretion. Yes. That's correct. Abuse of discretion, looking at what the district court did. But the point ---- Levin, we're talking about Levin, correct? Yes, Your Honor. He was a physician and toxologist, correct? Toxicologist, yes. Wasn't a chemist. Was not a chemist. He has a chemistry education, a BSc degree in chemistry, biochemistry, I believe. So we're really talking about whether one can say the activities of the defendant could release the amount of toxin necessary to cause the problem. And you're saying that this judge abused her discretion in saying that a physician and toxicologist, rather than somebody having something to do with chemistry, something to do with how the burning of solvents used in medical cleaning could result in dioxin, that simply because one is a doctor, he ought to have been able to opine about that release, and it's an abuse of discretion not to allow it? The abuse of discretion, Your Honor, with respect to the ---- You see, there are two Levin's reports. We have to look at the Levin report number one and Levin report number two. The Levin report number one, which was submitted on February 15, 2007, that was submitted in the context of the premium facial order. That was really something, you know, that the court has to address in the premium facial order. And in that report, we presented evidence to show that burning of wooden plank soaked in solvents creates a dioxin. There is no dispute on that issue. Even the defendant expert, you know, in responding to our expert's opinion, submitted a report agreeing to that proposition, you know, the scientific proposition that when you burn solvents which are in a wood, you know, in the wood, the solvents create dioxin. There is no question about that. And the dispute is really ---- Well, you haven't really answered my question. I mean, my question was, the ultimate question was, does the burning, how the burning of solvents used in a medical cleaning could result in the release of a dioxin? And it seems to me that the district judge said, in her discretion, a physician and toxicologist can't tell me that. You've got to have a chemist. You've got to have somebody better than that. And you're saying that that's an abuse of discretion. It becomes an abuse of discretion because if an expert is qualified to testify on an issue based on education and experience, and we have submitted documents showing Levin was also a consultant, you know, who consulted on dioxin to other firms. He has also a training in chemistry, if chemistry is an important requirement. He has experience in the field. So if the judge disregards his opinion on the ground that he does not have a qualification to make an opinion as to how dioxin is created, then that would be an abuse of discretion, Your Honor. I understand your argument. Sure. Thank you. Your time has expired. Sure. Thank you. I've given you extra. Sure. We'll then hear from Mr. James. May it please the Court, and good morning. My name is Colley James. I'm from Latham & Watkins, and we are counsel record for the defendant appellees in this case. I'd like to first quickly address a discovery issue raised by Mr. Simpich with respect to whether it was unfair and abuse of discretion to order plaintiffs to provide their expert and other testimony on March 15th of 2008. Before you do that, I'd kind of like to set the pattern of what all is involved here. This is a class action started out with 1,100 plaintiffs. Not technically a class action, Your Honor. It's individual lawsuits, although you're correct. It's between 1,000 and 1,100 plaintiffs in the original Avala and consolidated actions. All right. So the 775 were non-settling plaintiffs. So the rest of them, I gather, settled? Yes, Your Honor. In approximately 2004, there was a hopeful global settlement that was reached. Certain plaintiffs then pulled out of that and went on with their actions. So several hundred did go through with the settlement at that time, and then thereafter, there were a few other settlements that occurred, partisan mediation and a few independent ones, solitary ones. Okay. And then there were 323 that were dismissed for failure to fill out questionnaires. Yes, Your Honor. And then there were 359 dismissed on the statute of limitations grounds. Correct. Many of whom ultimately settled in the initial attempt at a global settlement. Okay. And the rest of them, for various reasons, a smaller number. The ones that I'm concerned with are those that were dismissed on the statute of limitations grounds. Yes. I would like to know how you can distinguish the O'Connor case, which seems to be almost identical. Sure, Your Honor. The issue on appeal with respect to the statute of limitations, and this involves 160 of the appellants who were dismissed on the should-have-known discovery rule standard. The issue obviously turns on the discovery rule, and the discovery rule in this case comes from CERCLA and says that the limitation period begins to run on the date which the plaintiff knew or reasonably should have known that the personal injury was caused by the exposure. It is the plaintiff's burden to present those facts, and to invoke the discovery rule, the plaintiffs must plead and show facts which show the time and manner of discovery and the inability to have made earlier. The statute of limitations is the burden of the defense, right? Not in the discovery rule instance, Your Honor. In the discovery rule instance, it becomes the plaintiff's obligation to establish the facts necessary to invoke the discovery rule. This comes from Hopkins v. Downing Court, and it says that the plaintiff must plead and show the facts showing their time and manner of discovery and the inability to have made earlier discovery. In O'Connor? Pardon me? Is that what was decided in the O'Connor case? Well, O'Connor recognizes that it remains the plaintiff's obligation to invoke the discovery rule. Then O'Connor goes on to look at certain facts that were presented in that case and whether or not there was a question of fact and whether it should go back to the jury or whether the summary judgment was proper. Why isn't it a question of fact for the jury when you're establishing a statute of limitations on the basis of what they should have known from publications? Well, Your Honor, plaintiffs correctly cite O'Connor on this issue of whether or not you can rule on summary judgment based on the issue of media reports alone. However, that's not the situation presented here. As was mentioned earlier, defendants presented at the summary judgment level a wealth of information readily available to the plaintiffs that came from a variety of sources. Certainly, there were over 264 media reports during the relevant time period, but there was a wealth of other information available to them, including the fact that Willetts is a very small town, which is a relevant issue, and that the facility is located directly smack dab in the middle of town. There were public meetings. Governmental agencies became involved and put out notices. There were plaintiff law firms canvassing the town looking for clients. There was a community outreach program that was instituted. These are important facts to be considered, but why aren't they facts to be considered by the jury in determining whether they should have known? When you have a statute of limitations, usually the statute is pretty clear about when something happened. In this case, we're talking about when somebody should have known, and all those things you mentioned would be certainly something the jury should consider, but it seems to me that it's a question of fact. Well, if there is an issue of fact, it would become a question of fact for the jury to decide, but what we're looking at here is the record that was presented at the summary judgment phase. As I've gone through, defendants put up a wealth of information. In response, plaintiffs only put up declarations, and those declarations were very limited in what they established. The only thing they established was what they actually knew. They said the time that they ultimately discovered their claims. Now, O'Connor says, whether plaintiffs, and I quote, at 1154, whether plaintiffs would have suspected on the basis of media reports and whether contamination caused their injuries in light of the evidence that the parties presented is fundamentally a question of fact, and the important phrase there is in light of the evidence that the parties presented, and I submit, Your Honor, that plaintiffs may have put up evidence regarding what they actually knew, but they put up nothing on the issue of what they should have known and whether the facts that were readily available could have been discovered by them with reasonable diligence, which is the standard put out that is applicable in this case. The truth is they did not satisfy their burden to raise an issue of fact at the underlying level. Counsel for Appellants also talked about the equivocal nature of the media reports that were out there. However, they again overstate O'Connor on this issue. O'Connor does not create a bright line rule prohibiting summary judgment if there's not definitive proof that an exposure could cause an injury. It simply says that if there are multiple causes possible, then the fact of the injury itself does not itself create, quote, the usual incentive to investigate the possibility that the known injury may give rise to a legal claim. One thing I want to clear up, as I understand it, the dismissal on the statute of limitations was a dismissal, not a summary judgment. It was a summary judgment that was brought on the statute of limitations ground, Your Honor. Leading to the dismissal. Leading to the dismissal ultimately, yes. Let me ask you a couple of questions. Yes, Your Honor. My understanding from your argument now that you're suggesting that at the point a reasonable person either would not have expected to or would have been expected to inquire about the cause of the injury such that they would know that they ought to get something done, and at the point they would inquire about the cause of the injury, then the inquiry would have disclosed or they would have at least had a chance to get the cause. Are you agreeing with that? I agree, Your Honor. That's the discovery date. Yes, Your Honor. And they get a year after that. Yes, Your Honor. Okay. If that's so, I have a tough time with the district court decision. So would you turn with me to the district court decision? I don't have it in front of me. It's on 199 of the transcript. And I'm trying to determine whether I can affirm this district court decision, because it seems to me that the district court found in its decision that the discovery date was August 24, 2000. The court premised that the latest date, if I recall correctly, that the latest date on which it became where a plaintiff should have reasonably suspected. This court finds that the only reasonable inference to be drawn is that all plaintiffs knew or should have known by August 24, 2000. I think that my ---- One day from the date on which Ms. Avila filed her suit that their alleged injuries were caused by the Remco facility. That might be inartful language. My understanding is the date, the operative date was August 23, 1999, when the Avila lawsuit was filed. And the discovery should have been done by August 23, 1999? Or August 24, the day after, I believe, that the lawsuit was filed. So they get a year after, they have a year within that date. So the day of the suit, then, is the day on which one would have had, one would have been at the discovery date. And they had a year after that. I believe the day after the lawsuit would have been, was filed. So in what relevance is the court talking about that after that date, Avila conducted her health survey? After that date, attorneys gave talks to Willis, in Willis, warning about the consequences of the statute limitations. It seems to me the court is saying the discovery date is August 24, 2000. And, therefore, the plaintiffs ought to have until August 24, 2001 to file their complaints. Well, first, I would, I would and will note that there are plaintiffs who are still at, that filed after that date. Because they filed up until January 6, 2002. I'm just trying to understand the court's order. Because I read that. I read in the preceding paragraph that, on the evidence available, it's plausible many residents remain unaware for a long period of time caused by the contamination. Particularly because, as the plaintiff notes, many of the newspapers rejected the allegations. However, after Avila files the suit, there was substantial publicity. So it seemed to me the court was saying, August 24, 2000 is the date of discovery. So, and then I thought, based on what I read there, and that's why it's unclear to me, then she struck everybody that was prior to the date, excuse me, after that date, August 24. In my book, Reading Your Decision, I would have thought she'd have given them another year and struck everybody after August 24, 2001, based on the law. Otherwise, I've got to go back to August 29, or 23, 1999, and I've got to see all the things that happened before that. Because I've got to have all kinds of information getting out there, all kinds of extra stuff, a year prior to August 23, 1999. Otherwise, the statute doesn't work. Well, Your Honor, it's important that there is a tremendous amount of information and publicity that predates the filing of the lawsuit and certainly follows after. Frankly, reading your stuff, there's not a whole heck of a lot prior to August 23, 1999. Certainly the media coverage explodes, but there is quite a bit, because it's in 1995 that the first concerns are raised, a consent degree is developed, community outreach program is instituted, and the very extensive investigation or remediation of the site and the surrounding area begins in 1998. Your Honor, I concede the district court's decision to suggest that the date of discovery, what we're talking about, the plaintiff should have known, is August 23, 1999, not August 24, 2000. What I'm saying, Your Honor, is the It's got to be if we're going to follow the district court's decision. What I'm saying, Your Honor, is that the plaintiffs who were dismissed on statute of limitations grounds, the first of them, the earliest of them, filed their claims on January 16, 2001, which gives them until January 17, 2000. They had to show facts which would be unique and different that would allow them to should have known of their sites. That really becomes the important date. By summary judgment, our review is to no vote, right? Well, yes, Your Honor. So if the district court misstated the date, does it matter? I mean, I'm just trying to find out whether it matters. Clearly, Judge Smith is absolutely correct in what the district court did, and it's puzzling, unless it was a mistake. But my question is, so what? Because our review is the same as the district court's. So if we were to look to see whether before January, which is when the next suit was filed, and I've forgotten the name of it, Arledge? Arledge, yes. It was filed in January. We look to see whether, as of that time, as a matter of law under O'Connor, it can be said that they were too late. Right. I think the best way I can describe it, Your Honors, is that if, at worst, the selection of the August 24, 2008, would be harmless error because the facts of the record that they knew or should have known of their claims and could discover the facts that were relevant with reasonable diligence more than a year before they filed their claims on January 6, 2001. Did you appeal that issue? Because I'm not willing to take an issue you didn't appeal. Well, I'm not the appellant, Your Honor. I understand. That's why I didn't appeal that issue. So I have to deal with what the district court did. Shouldn't I just send that back to the district court to determine what did you really do? Maybe you ought to look at this again. Well, I would submit on the record, Your Honor, that that would be unnecessary, and I hope that that would not be the outcome because the record is very clear that they should have known and could have discovered the facts within greater than a year. The facts were out there, and nothing new would have been discovered. If this were a trial, I would understand that. We can't make a trial decision. I'm repeating my question. We're on summary judgment. Yes, Your Honor. And we don't owe the district court any deference up or down on summary judgment, do we? No, Your Honor. So we can make our own call. Yes, you can. I would think. Well, I'd like to turn in the few minutes I have left to the question of the prima facie process, which I submit was well within the discretion of the court and appropriate under the circumstances. As was earlier noted, Rule 16 provides the district court with wide discretion to come up with appropriate procedures. And in this case, it was a very appropriate procedure. It dealt with a defined group of plaintiffs, plaintiffs who were not born or did not live in Willits until after my clients had sold the facility. Therefore, they had no opportunity for direct exposure to operations, and it made them very unique to people who did live in Willits during the operating period of my clients. Moreover, there is no claim, there is no credible claim that plaintiffs suffered any prejudice as a result of this presence. They were put on notice years in advance that this showing would be required. When they asked for additional time, they were given additional time, and were told at that time you must produce all causation and exposure evidence or face exclusion. And defendants were given the exact same amount of time as plaintiffs in the underlying action. There's no claim of prejudice here. And the truth is that plaintiffs chose not to take the depositions of any of defendants' experts. It's not a question of whether they had or did not have enough time, which they did not ask for an extension on, but they simply chose not to do the discovery even though they had time to do it. And then the record, as it developed in the remaining time, very much established that Dr. Levin, their sole causation expert, in addition to having qualification issues, simply fabricated most of the fundamental theories of his case. Let me ask you a question about dismissing the IIED claims. Yes, Your Honor. It's my understanding the law is that one ought to be aware of particular plaintiffs in these kind of claims, and that's your argument that they were not aware, correct? They had to be specifically aware of the specific plaintiffs, Your Honor. Let me ask you about the facilities that are directly around this factory, the school, the supermarket, the residences where pollution was released. Your clients need not know the names or identities of those particular people, just their existence. But I guess my worry is, is there a question of fact as to these particular claims simply because Frank Avila alleges that the defendants were aware of these residents and dumped contaminants at night? Don't you think there's a question of fact as to whether, in that particular instance, one could make a claim under 2ED? Your Honor, I think the case of Potter governs here, and it says that it must be in the presence of a plaintiff of whom the defendants are aware. In that case, Potter presented a similar example, where it was not unknown and unknowable that people were in the surrounding area, but even so, it was found to be a deficient showing. Well, my worry is, I know the conduct has got to be directed, and I know the defendant has to be aware and recklessly disregard the probability, and so therefore I'm looking very tough at this. They need not know their names or identities, just their existence. The mere fact that one says they were aware enough about this that they dumped this stuff at night, at least those surrounding the plant, isn't that enough for a question of fact? That's really what I'm asking. Well, Your Honor, first of all, the allegation that they were dumping at night is an unsubstantiated allegation. Potter had a very egregious set of facts, which appeared not to be in dispute about willful dumping in the immediate vicinity of these people, and it was still found deficient. This case doesn't present this situation. All of the allegations of willful dumping and egregious contact were never substantiated and never became part of the record. It only became a question of just whether the operations of the facilities in and of themselves caused exposures to the plaintiffs, and in that instance there is not this situation where egregious conduct therefore creates a sliding scale on whether they should have known that there might be an impact to the surrounding instance, and in the absence of that kind of egregious contact, you can't then say, well, I should have known that my regular activities were going to cause injuries to plaintiffs and I acted in reckless disregard of those people's interests. I know your time has expired and it wasn't specifically argued by your opponents on appeal, but something I have big concern about, and I'd like to have your answer, is the award of $120,000 in costs that are joint and several liabilities. Why would they be joint and several? I believe ‑‑ I'm pulling from memory on this issue, Your Honor, but it is my memory at least that the law does not ‑‑ it says that all plaintiffs are the losing party is responsible for all costs, and that one, because one is unable to pay, doesn't mean that the other, any other plaintiff is off the hook. What others mean is that either this defendant or whoever he assigns it to, the collection agency, could go to the one person who's rich that was dismissed on a statute of limitations ground and say, you owe me $120,000. I think there would be outer limits to what would be fair once there was an action taken on collection. And defendants agreed that there needs to be an equitable allocation of costs in an informal process. But to say that they should be up front divided in some form or fashion and that a plaintiff and the defendants are just categorically out money if a person can say that they can't pay it is unfair. But this person that I ‑‑ whose action was dismissed on the statute of limitations, and he is faced with $120,000. I think at that point that person would need to come into court and seek some sort of redress based on the unfairness or seek indemnity, if you will, against his co‑plaintiffs. Yeah. Leave it to him to sue everybody else. I can't understand why this would be awarded as joint and several, so that it's against every person the full amount. That seems to me an abuse of discretion. It could be by categorization, because after, say, those who were dismissed on the statute of limitations, there was a lot of litigation inserted after that, a lot of costs happened after that. I just ‑‑ I can't see how this could be upheld. And you say, well, go to a court and try to get some adjustment, but there's nothing in writing or in the court order that gives them a right to do that. I ‑‑ candidly, Your Honor, I wasn't prepared to discuss the cost issue, since that was a separate appeal. However, my understanding, my memory is the law does provide for joint and several liability when it comes to allocation of costs, which defendants are entitled to recover in this instance. Anything else? Okay. Thank you. Thank you. Mr. Sedlich. Thank you. Just one minute. On the emotional distress issue, I just wanted to flag the fact that our responses to interrogatories addressed precisely the exhaust vents that sent out the hexavalent chromium across the street on the very issue of Potter. The record is very clear. It's on page 55 of our reply brief.  Okay. All right. Thank you, Counsel. Your argument of the matter just heard will be submitted, and the court will stand in recess for the day. All rise.
judges: Hug, Rymer, Smith N. R.